UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:21-CR-00060-JJM-PAS |
| ) | |
| MICHAEL WILLIAMS ) | |

**SENTENCING MEMORANDUM**

Defendant Michael Williams ("Mr. Williams"), by and through undersigned counsel, hereby submits this memorandum of law to assist this Honorable Court in reaching the appropriate disposition in this matter. On June 17, 2021, Mr. Williams entered into a plea agreement with the government pursuant to Rule 11 of the Federal Rules of Criminal Procedure whereby he agreed to waive indictment and plead guilty to a one-count information charging him with the crime of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and § 1344. Mr. Williams pleaded guilty to the information on July 7, 2021. Pursuant to the plea agreement, the government has agreed to recommend a sentence at the low end of the applicable guideline range, which is 41 months in prison.[1] The plea agreement permits Mr. Williams to argue for any sentence or sentencing range in accordance with 18 U.S.C. § 3553(a).

Mr. Williams contends that the factors enumerated in 18 U.S.C. § 3553(a) favor a sentence of 37 months in prison, which is a mere four months less than the government's recommendation. The section 3553(a) factors especially pertinent here include (1) the nature and circumstances of an offense resulting from addiction and (2) Mr. Batista's personal history, including a lifetime wrought with drug addiction and mental health issues. A 37-month sentence would allow Mr. Williams possible immediate placement in the United States Bureau of Prisons

---

[1] Mr. Williams has no objection to the United States Sentencing Guidelines calculations as set forth in the Presentence Investigation Report.

("BOP") 500-Hour RDAP program if the Court recommends it. Mr. Williams is certainly a person who needs the RDAP program along with its attendant mental health counseling and follow-up residential drug treatment. Based upon the § 3553(a) factors, therefore, Mr. Williams suggests that the appropriate disposition in this case is a sentence of 37 months in prison.

## FACTS AND BACKGROUND

### Mr. Williams' Personal History and the Circumstances of His Conduct in the Instant Case

Twenty-six year-old Michael Williams hails from a lower income family in Rhode Island. Born in Providence in 1995, he lived with his mother, father and brothers until his parents separated when he was seven years old. In 2002, Mr. Williams' mother packed up her children and left Providence for Atlanta, Georgia. At that time, Mrs. Williams had no ties whatsoever to Atlanta or the State of Georgia but, as a victim of domestic violence, she sought sanctuary in a place where her husband would not follow.

Although Mr. Williams' father apparently did not physically abuse him or his brothers, he mercilessly beat and tortured Mr. Williams' mother. A violent criminal, Mr. Williams' father spent many years incarcerated at the Adult Correctional Institution ("ACI") in Cranston. Mrs. Williams, who tolerated the physical abuse for years, feared her husband would eventually turn his violent predilections onto their children. She viewed relocation to a place far from Providence as her best and only option for Mr. Williams and his brothers.

Life proved difficult for Mrs. Williams and her family when she arrived in Georgia. Mrs. Williams obtained a job in Atlanta and received state assistance but she raised her family on an income of $1000 a month. A single-family income of $1000 a month left Mr. Williams without some of the basic necessities that most children have in their childhood and teenage years. Mr. Williams also lacked a healthy relationship with his father.

Separated from his father by many miles, Mr. Williams desperately sought a healthy relationship with him. His father had no interest. Not only did Mr. Williams' father ignore his son, he engaged in emotional abuse when he did interact with his child. Mr. Williams's father told his son that he was worthless and would never amount to anything. Mr. Williams' father lavished praise and attention upon his brother but remained distant from Michael. When Mr. Williams' brother graduated from high school, Mr. Williams's father flew to Atlanta to attend the graduation ceremony. When Mr. Williams graduated from high school, his father not only failed to attend the ceremony but he did not even offer a congratulatory phone call. Mr. Williams' mother reports that the emotional abuse from his father has traumatized her son.

Despite the obstacles he faced, Mr. Williams did graduate from high school. He even married his high school girlfriend and they had a child. While his wife decided to enlist in the Army, he found work as a rapper in Atlanta. Identified as a potentially talented entertainer, Mr. Williams often received $15,000 for his stage performances. Mr. Williams, however, temporarily waylaid his burgeoning entertainment career when the Army stationed his wife at Fort Drum in New York. Mr. Williams chose to follow his wife to her assignment in New York. When the Army deployed his wife overseas, however, Mr. Williams elected to return to Atlanta with their child. At that point, Mr. Williams developed an opioid addiction.

A heavy and frequent marijuana user since his teenage years, Mr. Williams turned to opioids likely to combat depression. When his opioid use blossomed into an addiction, Mr. Williams, who had found only sporadic work as a rapper since his return to Atlanta, turned to criminal activity to support his addiction. Mr. Williams and his coconspirators engaged in a scheme to defraud banks into providing them with instant cash ideal for supporting a quick-fix drug habit. The scheme they employed by utilizing homeless people to cash checks at various

banks is neither novel nor unique.  In fact, it is a garden variety scam employed throughout the country for more than a decade.  See United States v. Thornton, 718 Fed. Appx. 399 (6th Cir. 2018); United States v. Norwood, 774 F.3d 476 (8th Cir. 2014).  In this case, Mr. Williams and his coconspirators primarily operated in Southern Maine, Southeastern Massachusetts and the Providence area of Rhode Island until the Providence Police arrested Mr. Williams and another individual outside a bank on February 5, 2021.

Following the initiation of bank fraud charges in this Court and a detention hearing, the Court released Mr. Williams on conditions to live in the Northern District of Georgia with his family.  As one of the enumerated conditions, the Court required Mr. Williams to remain drug free.  Mr. Williams, however, not only tested positive for marijuana, he tested positive for opiates and admitted to purchasing Percocet.  At the request of his supervising Pretrial Services Officer in Atlanta, Mr. Williams entered and completed treatment at St. Jude's Recovery Center in Atlanta.  Although Mr. Williams' supervising Pretrial Services officer noted his successful completion of drug counseling, he also noticed that Mr. Williams' GPS often traced to an empty parking lot in Atlanta at times when Mr. Williams supposedly worked staging events.  The empty parking lot in Atlanta is an area known for high drug trafficking where addicted individuals purchase narcotics.  When Mr. Williams' probation officer confronted him about his presence in a high crime/drug area, Mr. Williams soon incurred a violation for attempting to remove his GPS.

With the GPS violation pending, Mr. Williams incurred a further violation.  Specifically, on August 25, 2021, the Atlanta Police arrested Mr. Williams and two other individuals following a traffic stop.  Inside the motor vehicle, the police discovered three backpacks containing marijuana and gun located under the front passenger seat.  Mr. Williams was the

driver of the motor vehicle.  The police charged Mr. Williams and the other occupants with possession of marijuana with intent to distribute and possession of an unlicensed firearm.  The case remains pending in the Georgia courts (although the front seat passenger has supposedly taken responsibility for the gun and the marijuana).  As a result of the new offense and the GPS incident, this Court revoked Mr. Williams' bond and ordered his detention pending sentencing.  Housed at the Wyatt Detention Center since his return to Rhode Island in September, Mr. Williams has remained drug free.  He has, however, developed a serious case of COVID-19 after Wyatt officials placed him in a holding cell with two COVID-positive individuals.

## ARGUMENT

### This Court should impose a 37-Month Sentence.

Mr. Williams respectfully asks this Court to impose a sentence of 37-months in prison, as the nature of Mr. Williams' offense coupled with his history and personal characteristics favor a sentence minimally below the sentence recommended by the government.  The slightly lower sentence recommended by Mr. Williams, however, offers him the chance for needed drug treatment and mental health counseling through the possibility of immediate placement in the BOP's 500-Hour RDAP program.

In asking the Court to impose a sentence of 37 months in prison, Mr. Williams notes that the United States Sentencing Guidelines as promulgated by the United States Sentencing Commission do not bind the federal courts.  United States v. Booker, 543 U.S. 220, 259 (2005).  Indeed, the United States Supreme Court's landmark decision in Booker declared the mandatory provisions of the United States Sentencing Guidelines unconstitutional.  Id.  Booker, however, reaffirmed a sentencing court's duty to sentence a defendant in accordance with those provisions of the Sentencing Reform Act specified in 18 U.S.C. § 3553(a).  Thus, although not bound by

the guidelines, this Court must nevertheless consult and consider them when imposing sentence. Booker, 543 U.S. at 264. Further, the courts of appeals may not disturb a district court's sentence unless the appellate court finds that sentence unreasonable. See id.

In Gall v. United States, 552 U.S. 38 (2007), the United States Supreme Court clarified the post-Booker sentencing procedure. The Gall Court indicated that when sentencing a defendant,

> "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."

Gall, 552 U.S. 49-50 (internal citations and quotations omitted).

The First Circuit has further explained that while sentencing courts must employ "an increased degree of justification commensurate with an increased degree of variance" from the advisory sentencing guideline range, under a post-Gall rubric,

> "there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion.  Indeed, after Gall, the sentencing inquiry-once the court has duly calculated the GSR-ideally is broad, openended, and significantly discretionary.  At that point, sentencing becomes a judgment call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described."

United States v. Martin, 520 F.3d 87, 91-92 (1st Cir. 2008) (internal citations and quotations omitted) (affirming a 91-month downward deviation from the advisory sentencing guideline range).

Accordingly, regardless of the initial sentencing range calculated in the PSR, this Court must consider the § 3553(a) factors to determine whether a Guideline sentence or a sentence slightly below the guidelines is warranted. In doing so, this Court may not presume that the Guidelines range calculated in the PSR is reasonable. Gall, 552 U.S. 49-50. Rather, the Court, in the exercise of its discretion, must make an individualized assessment of the specific facts presented to determine whether they support the recommended sentence.

The § 3553(a) factors to be considered include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, to afford adequate deterrence, to protect the public, and to provide the defendant with needed educational or vocational training or medical care, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established by the United States Sentencing Guidelines, (5) any pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense. United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005).

Here, the section 3553(a) factors favor a very slight downward departure of four months below the sentencing range calculated in the PSR. In its sentencing memorandum and opposition to Mr. Williams' request for an evaluation to the Court's Deferred Sentencing Program, the government implies that Mr. Williams is a person of privilege who suffered no

disadvantages in life and committed his crimes purely out of greed. The government's characterization is demonstrably inaccurate. Mr. Williams is certainly not a child of privilege. He is the product of an economically disadvantaged background. His parents separated when he was seven years old and he grew to maturity in a home where his mother raised several children on an income of $1000 a month. He is a person who lacked the necessities most children have as he matured through childhood and into adulthood. It is unclear how his economic plight as a child impacted his mental health or his behavior as an adult.

It is also unclear how issues of addiction and mental health impacted his criminal behavior. As a small child, Mr. Williams lived in a home where his father mercilessly beat his mother. Witnessing this type of behavior as a small child may have led to mental health repercussions as Mr. Williams progressed through his teenage years and into early adulthood. Moreover, the abuse wrought by Mr. Williams' father did not confine itself to the physical abuse. Mr. Williams' father mentally abused his son by telling him he was worthless and refusing to acknowledge his high school graduation after flying to Atlanta to attend his brother's graduation. Mr. Williams who internalizes and minimizes his mental health issues offered no insight. His mother, however, believes his father's actions scarred him and that he needs mental health counseling to address the abuse issues from his childhood.

It is unclear whether the issues from childhood and abuse from his father contributed to Mr. Williams' opiate addiction. Mr. Williams, however, certainly suffers from an addiction. He participated in the instant criminal activity, at least in part, to acquire immediate cash to feed his addition. When this Court released him on conditions of no illicit drug use, the strength of addiction overpowered Mr. Williams. Despite knowing that a violation of his conditions could lead to a revocation of his release status, Mr. Williams purchased and used Percocet. His use led

to his enrollment in an outpatient drug treatment program. Despite his enrollment, however, Mr. Williams, rather than work as required as a condition of his release, frequented an area of Atlanta known as a drug haven for addicts. His behavior suggests that his crimes emanate from addiction.

In addition to mental health and addiction issues, Mr. Williams asks this Court to note his age at the time of this offense and its potential impact on his decisions. Although Mr. Williams does not offer addiction, mental health or age as an excuse for his actions, it does appear that his crimes were the product of youth. As the United States Supreme Court noted in Gall, "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage." Gall, 128 S. Ct. at 601 (internal citations and quotations omitted). Indeed, when evaluating the sentencing decision under a highly deferential abuse of discretion standard, the Supreme Court upheld the district court's reasoning that youth is a relevant factor in a sentencing decision. The Gall Court quoted the language of the district court's memorandum opinion where the district court concluded that "[i]mmaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. The recent National Institute of Health report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant." Gall, 128 S. Ct. at 601 (quoting U.S. District Judge Robert Pratt's memorandum opinion) (internal quotations and punctuation omitted).

Here, Mr. Williams was 24 and 25 years old when he committed the instant offense. Viewing his crime through the lens of a young man with a drug addiction and mental health

issues, those factors certainly mitigate his misconduct. The Court has designed the Deferred Sentencing Program to provide mental health and drug counseling to individuals who want to understand exactly what led them to commit the crimes they committed and how they can avoid recidivist behavior. While this Court has determined that Mr. Williams is not an appropriate candidate for the Deferred Sentencing Program, the next best option is participation in an intensive drug treatment program like RDAP that also contains a mental health component. Through participation in the RDAP program, Mr. Williams has an optimal chance to understand the source of his addiction and what has led him to participate in criminal activity. If Mr. Williams can gain insight into the source of his behavior, he has the prospect of achieving success as a law abiding citizen.

     Mr. Williams has no criminal record. He has a wife and a child. He enjoys strong support from his mother and extended family both in Atlanta and Providence. People in the entertainment industry have noticed his talent as a rapper. If Mr. Williams can conquer his addiction and mental health issues and understand why he has acted the way he has, then, with the support of his family, he stands a substantial chance of leading a life as a productive (and possibly highly successful) member of society. A sentence of 37 months in prison allows for the possibility that the BOP may immediately designate him into the RDAP program prior to his arrival into BOP custody. Consistent with 18 U.S.C. § 3553(a), Mr. Williams asks this Court for a very slight downward departure and a sentence of 37 months in prison.

## CONCLUSION

For the foregoing reasons, Mr. Williams respectfully asks the Court to impose a sentence of 37 months in prison. Mr. Williams also respectfully requests that the Court recommend his placement in the BOP's 500 Hour RDAP program.

        Respectfully submitted,
        MICHAEL WILLIAMS
        By and through his Attorneys,

        /s/ Gary G. Pelletier
        Gary G. Pelletier (RI Bar 5723)
        PELLETIER, CLARKE & CALEY, LLC
        35 Touro Street
        Newport, Rhode Island 02840
        Tel:   (401) 849-4400
        Fax:  (401) 619-3451
        Email:  gpelletier@pcclaw.net

Dated: January 23, 2022

### Certificate of Service

I, Gary G. Pelletier, hereby certify that on January 23, 2022, I served a copy of the within Sentencing Memorandum upon Assistant United States Attorney Lee Vilker and all parties of record via ECF.

        /s/ Gary G. Pelletier